· (No. 28416.—

S. BUCHSBAUM & Co. *et al.*, Appellants, *vs.* ROBERT L. GOR-
DON, Director of Labor, Appellee.

*Opinion filed January 17, 1945—Rehearing denied March 20, 1945.*

Moses, Kennedy, Stein & Bachrach; Brown, Fox & Blumberg; Daily, Dines, White & Fiedler; Eckhart, Klein, McSwain & Campbell; Henry J. & Charles Aaron; Kirkland, Fleming, Green, Martin & Ellis, and Pope & Ballard, all of Chicago, and Barr & Barr, of Joliet, (Walter H. Moses, Walter Bachrach, and Robert C. Kelso, all of Chicago, of counsel,) for appellants.

George F. Barrett, Attorney General, (William C. Wines, of Chicago, of counsel,) for appellee.

Mr. Justice Smith delivered the opinion of the court:

This cause originated in a claim for refund or credit, filed with the Director of the Department of Labor, under

section 25(d) of the Unemployment Compensation Act. The claim was filed by S. Buchsbaum & Co. The Director denied a refund and dismissed the claim. The claimant removed the cause to the circuit court of Cook county by *certiorari*. In the circuit court, thirteen *mandamus* suits, brought by various employers against the Director, were consolidated with the *certiorari* case. The petitions for *mandamus* in each case prayed for a writ ordering the Director of Labor to expunge from his records, kept pursuant to the Unemployment Compensation Act, the entry fixing the contribution rate determined for each petitioner for the calendar year 1944. The circuit court, upon a hearing, confirmed the action of the Director disallowing the claim for credit or refund, and quashed the writ of *certiorari*. In the *mandamus* cases, the motions of the Director to strike were sustained, and the petitions were dismissed. This appeal seeks a review of all of those orders.

In all of the cases, the issue was raised as to whether section 18(c)(5)(B) of the Unemployment Compensation Act, as amended in 1943, constitutes any part of the law of Illinois. It is contended that said section of the Unemployment Compensation Act, as amended in 1943, was repealed by the subsequent passage of another amendment to the same section, at the same session. It is also contended that said section violates various provisions of the constitution of the State and of the United States. In this opinion, S. Buchsbaum & Co. and the thirteen petitioners in the *mandamus cases* will be referred to, collectively, as appellants.

The Unemployment Compensation Act, originally enacted in 1937, creates a fund administered by the Director of Labor, available for the payment of unemployment compensation. This fund is maintained by the payment of contributions by employers subject to the act. The portion of the act dealing with the rates and payment of contributions by employers is section 18. Originally, section 18 im-

posed an arbitrary statutory rate of 2.7 per cent on the wages paid by each employer subject to the act. Thereafter, section 18 was amended so as to provide that the Director should determine the rate of contributions for all employers, based upon their employment experience and upon the employment experience in the State at large. The formula for computing and fixing the variable experience rates of contribution of employers for each year was set out in section 18(c).

In 1941, the legislature, obviously recognizing the need of a study of the provisions of the act relative to experience rating, enacted section 18(d) of the Unemployment Compensation Act. (Ill. Rev. Stat. 1941, chap. 48, par. 234.) By this act, the Board of Unemployment Compensation and the Free Employment Office Advisors, created by section 6 of the Civil Administrative Code, were authorized and directed to study and examine the provisions of the Unemployment Compensation Act providing for experience rating, in order to determine whether the rates of contributions for the calendar year 1943, and each year thereafter, would be sufficient to replenish the amount of benefits paid out, and to determine the effect of experience rating upon labor and industry. They were directed to submit their findings and recommendations, based on such findings, to the sixty-third General Assembly. Such investigation was conducted and findings made. A report was transmitted to the Governor and to both Houses of the General Assembly on April 27, 1943. As a basis for determining the purpose of the amendments hereinafter considered, and the evils sought to be remedied, a quotation from that report is pertinent:

"These war expanded employers under the experience rating plan are being assigned reduced rates of contributions which reduced rates of contribution were earned on the basis of the three prior years of experience which included both non-war and war production and represented

much smaller pay rolls. The result is that these war expanded employers during this period would pay contributions at these reduced rates on increased pay rolls and would thus not bear a fair share of the potential post-war burden. Clearly, when these employers contribute at reduced rates they cannot contribute an amount sufficient to take care of the potential liability created by their workers employed in these war expanded industries, who are acquiring benefit rights which are many times greater than the contributions which are being or will be paid on their wages. Moreover, even if these employers are assigned higher rates under the experience rating plan in the post-war period, such higher rates on reduced pay rolls will not result in a sufficient yield of contributions to meet the benefits paid to the workers laid off by these employers."

On May 6, 1943, two bills were introduced in the Senate. These bills were numbered 398 and 399. Senate Bill No. 398 amended section 18, only, of the Unemployment Compensation Act. Senate Bill No. 399 amended various sections of said act, including section 18. The amendment of section 18, as set out in Senate Bill No. 398, was substantially identical with the amendment of section 18 made by Senate Bill No. 399, except that section 18, as amended by Senate Bill No. 398, contained what is referred to in the record and in the briefs as the "War Risk Amendments." Said amendments will be hereinafter so designated and referred to in this opinion. By these amendments, it was provided that "(B) Any provisions of this section to the contrary notwithstanding," certain war risk rates were to be paid for the last six months of the calendar year 1943, applicable to wages paid in excess of $50,000, and for the calendar years 1944 and 1945, applicable to wages paid in excess of $100,000, by certain employers subject to the act.

Treating the War Risk Amendments as a part of section 18, the Director made contribution rate determinations

for appellants for the year 1944, in accordance with those amendments. With respect to S. Buchsbaum & Co., and all of the petitioners in the *mandamus* suits, except four, he determined in each case a rate based upon benefit experience ranging between .5 per cent and 1.5 per cent, applicable to wages paid during 1944, not in excess of $100,000, and an additional rate of 2.7 per cent applicable to wages paid during the year 1944, in excess of $100,000. The record shows that the pay roll of each had increased, in the calendar year 1943, more than 150 per cent over their respective pay rolls for the calendar year 1940. As to the petitioners in the *mandamus* suits, not included in the above computation, the Director fixed their rates at .5 per cent, applicable to the first $100,000 of wages paid during the year 1944, and an additional rate of 2 per cent, applicable to wages paid in excess of $100,000. The record shows that the pay roll of each of these petitioners increased, in the calendar year 1943, more than 100 per cent but less than 150 per cent over their respective pay rolls for the calendar year 1940. The computations made by the Director are not questioned as to their mathematical accuracy. Nor is there any question raised that such computations were made in accordance with the War Risk Amendments of section 18 of the Unemployment Compensation Act, as amended by Senate Bill No. 398. The sole question presented on this branch of the case is whether section 18, as amended by Senate Bill No. 398, was repealed by the passage of Senate Bill No. 399 later on the same day. The legislative history of Senate Bills Nos. 398 and 399 is as follows:

As already observed, the two bills were introduced on the same day. Senate Bill No. 398 was passed by the Senate without amendment, on June 16, 1943. It was passed by the House without amendment, during the morning session of June 24, 1943. Senate Bill No. 399 was passed by the Senate on June 9, 1943. It was amended in the

House, and as amended, passed by the House during the morning of June 24, 1943, immediately preceding the passage of Senate Bill No. 398. It was then returned to the Senate for concurrence in the House amendment. The House amendment to Senate Bill No. 399 was concurred in by the Senate on the evening of June 24, 1943. Both bills were approved by the Governor on June 30, 1943.

It is the contention of appellants that the effect of the concurrence by the Senate, in the House amendment to Senate Bill No. 399, being later in point of time, repealed section 18, as amended by Senate Bill No. 398, which was finally passed by the House earlier on the same day.

The rule as to the effect of the passage of different amendments to the same statute at the same session of the legislature is well defined. The rule is that if the two amendments are so inconsistent that both cannot operate and be given effect, the later amendment in point of time controls. In the case of *People ex rel. Heaton* v. *Illinois Central Railroad Co.* 295 Ill. 408, this court considered two amendments to section 112 of the Roads and Bridges Act, relating to the rate at which taxes could be levied. The section was twice amended at the same session of the General Assembly. Each amendment provided a different rate. It was held that the two acts, being inconsistent, could not both operate or be given effect, and the amendment passed later, in point of time, repealed by implication the amendment passed earlier in point of time. It was there said: "Two acts that are passed at the same session of the legislature are not to be construed as inconsistent if it is possible to construe them otherwise, but where it is impossible to give effect to both acts the latest in point of time will prevail."

The same question was presented in *People ex rel. Hines* v. *Baltimore and Ohio Southwestern Railroad Co.* 366 Ill. 318. In that case, section 25 of the Counties Act, fixing the rate at which taxes could be levied, was amended three

times during the same session of the General Assembly. Each amendment fixed a different rate. It was held that the last act passed, being the latest expression of the legislature, was the one which must be given effect, and that the two earlier amendments were repealed by implication. It was there said: "It is a general rule that where an act, or section of an act, is amended so as to reâd as it is repeated in the amendatory act, all such portions of the old act or section as are not repeated in the new act are repealed without any express words for that purpose, but all such portions of the old law as are retained, either literally or substantially, are regarded as a continuation of the old law and not as a new enactment."

It is equally well settled that amendments are to be construed together and with the original act to which they relate as constituting one law and as a part of a coherent system of legislation. (*City of Altamont* v. *Baltimore and Ohio Railroad Co.* 348 Ill. 339; *People ex rel. Adams* v. *New York, Chicago and St. Louis Railroad Co.* 316 Ill. 452; *Spiehs* v. *Insull,* 278 Ill. 184.) The statement in *Klemme* v. *Drainage Dist. No. 5,* 380 Ill. 221, that a later law which is merely a re-enactment of a former law does not repeal an intermediate act which has qualified or limited the first one but the intermediate act will be deemed to remain in force and to qualify or modify the new act in the same manner as it did the first, (on the authority of 25 R. C. L. p. 937, par. 187,) is subject to the modification that the two acts are not so inconsistent that both cannot stand and be given effect. 50 Am. Juris. p. 558, sec. 553.

Where acts are passed at the same session, containing conflicting provisions, the whole record of the legislation will be examined in order to ascertain the legislative intent which, if ascertained, must be given effect, regardless of priority of enactment. (*Mette* v. *Feltgen,* 148 Ill. 357.) The provisions of any statute, so far as they are the same as those of any prior statute, must be construed as a con-

tinuation of such prior provisions and not as a new enactment. (Ill. Rev. Stat. 1943, chap. 131, par. 2.) It is also the rule that when the legislature enacts an amendatory statute providing that a certain act shall be amended so as to read as repeated in the amendatory act, such portions of the old law as are repeated in the new act, either literally or substantially, are to be regarded as a continuation of the old law and not the enactment of a new law on that subject. (*People* v. *Lloyd*, 304 Ill. 23; *Svenson* v. *Hanson*, 289 Ill. 242.) In all cases the primary question is the intention of the legislature, rather than the technical priority of the passage of the acts.

The record shows that the War Risk Amendments were recommended and strongly urged by the Board of Unemployment Compensation and Free Employment Office Advisors, in their report made to the Governor and to both Houses of the General Assembly. In this report, the amendments were said to be absolutely necessary to protect the solvency of the unemployment compensation fund during the post-war period of decreasing pay rolls and increasing claims for compensation payments. The same facts were forcibly stressed in a statement made on the hearing on Senate Bill No. 398, before the Senate Committee on Industrial Affairs, by the Commissioner of Placement and Unemployment Compensation of the Department of Labor. The report of the Board of Unemployment Compensation and Free Employment Office Advisors, made to the Governor and the General Assembly, after reviewing the history of the Unemployment Compensation Act, and the prior amendments thereto, made separate recommendations as to the War Risk Amendments to section 18, and as to certain administrative amendments of minor importance, contained in Senate Bill No. 399. The record also shows that certain representatives of the Federal government were opposing the War Risk Amendments. Their objection was obviously made because many war expanded

employers were operating under government contracts on a "cost plus" basis, and any increase in contributions would increase the cost to be ultimately paid by the Federal government.

The record justifies the conclusion that the reason the two acts, the one including the War Risk Amendments to section 18, and the other omitting those amendments, were introduced at the same time was the fear that the bill containing the War Risk Amendments might be defeated. Obviously, the purpose in introducing the two separate bills was to insure the passage of the administrative amendments to section 18, made by Senate Bill No. 399, regardless of the result of the final vote on Senate Bill No. 398. In other words, it was intended to separate the War Risk Amendments entirely from the noncontroversial administrative amendments contained in Senate Bill No. 399.

The legislative history shows that the two acts were treated as companion measures in both Houses of the General Assembly. They were introduced by the same member. When the bills were introduced in the Senate simultaneously, both were referred to the Committee on Industrial Affairs. The two bills were reported back by the committee with the recommendation that both be passed, and they were ordered to a first reading. On June 3, 1943, on motion, the two bills were taken up, one immediately after the other, read at large the first time, and ordered to a second reading. On June 8, 1943, Senate Bill No. 398 was taken up and read at large the second time and ordered transcribed and typed for third reading. Immediately thereafter, Senate Bill No. 399 was taken up and read at large the second time. On second reading, a slight amendment was made to Senate Bill No. 399, which is wholly unimportant here. It was then ordered that Senate Bill No. 399 be transcribed and typed for a third reading. On June 9, 1943, Senate Bill No. 398 was read a third time and, on motion, its consideration was postponed. Imme-

diately thereafter, Senate Bill No. 399 was taken up and read a third time and passed. On June 16, 1943, Senate Bill No. 398 was passed.

The House Journal shows that on June 15, 1943, Senate Bill No. 399 was taken up and ordered to a first reading. On June 16, the bill was read at large the first time, and ordered to second reading without reference. Shortly thereafter, and on the same day, Senate Bill No. 398 was taken up and ordered to a first reading. On June 17, 1943, Senate Bill No. 399 was read a second time and after an amendment to section 4 was adopted, increasing the amount of weekly benefits to workers eligible for compensation, was ordered to a third reading. Shortly thereafter, on the same day, Senate Bill No. 398 was taken up and read for the first time and ordered to a second reading without reference. On June 22, 1943, Senate Bill No. 399 was placed on third reading. On the same day, Senate Bill No. 398 was read the second time and ordered to third reading. On June 24, 1943, Senate Bill No. 399 was read the third time and passed. The clerk was ordered to inform the Senate and ask its concurrence in the House amendment to said bill. Immediately thereafter, on the same day, Senate Bill No. 398 was read a third time and passed.

The Journal of the Senate shows that on June 24, 1943, the Senate concurred in the House amendment to Senate Bill No. 399. Both bills were thereafter signed by the speaker of the House and the President of the Senate.

It thus appears that Senate Bill No. 399 was finally passed by the House on June 24, 1943, immediately preceding the final passage by the House of Senate Bill No. 398. However, inasmuch as there had been an amendment in the House to Senate Bill No. 399, it was necessary that that bill be sent back to the Senate for its concurrence in the House amendment. This concurrence was given on the same day, and only a few hours after the passage of

Senate Bill No. 398, in the House. The result was that the final action of the Senate on Senate Bill No. 399, was later in point of time than the final action of both Houses on Senate Bill No. 398.

The rule that where two conflicting enactments are passed at the same session, the latest enactment in point of time will prevail, as well as all other rules of construction dealing with repeals by implication, are mere canons of construction. Such canons are only aids to the ascertainment of the legislative intent and must yield to such intent if the same be otherwise. They should never be followed to the extent of defeating or overriding the definite intent of the legislature. *Illinois Central Railroad Co. v. Franklin County,* 387 Ill. 301.

In view of the legislative history of the two enactments appearing in the record, the intention to repeal the War Risk Amendments contained in section 18 as amended by Senate Bill No. 398, by the final action of the Senate in concurring in the House amendment to Senate Bill No. 399, cannot be assumed. The contention that the legislature intended that the later enactment in point of time should repeal Senate Bill No. 398, which was finally passed only a few hours earlier on the same day, cannot be sustained. The Journals of the two Houses show that the two acts were considered together. After mature consideration they were both passed. To assume that it was the intention of the legislature to repeal Senate Bill No. 398, by the final action taken in the Senate concurring in the House amendment to Senate Bill No. 399, is to impute to the legislature an absurdity which is not justified by the record. (*Ketcham v. Board of Education,* 324 Ill. 314; *People v. Day,* 321 Ill. 552; *Village of Glencoe v. Hurford,* 317 Ill. 203.) That it was not the intent of the legislature to repeal Senate Bill No. 398, by the later action of the Senate in concurring in the House amendment to Senate Bill No. 399, is further demonstrated by the fact that in both Houses,

Senate Bill No. 398 was passed after the passage of Senate Bill No. 399. It must, therefore, be assumed that it was the intention of the legislature that both enactments should be operative and given effect.

This brings us to the question of whether the two enactments are so inconsistent and irreconcilable that both can not stand and be given effect. The rule is that when two statutes pertaining to the same subject matter are passed at the same session of the legislature, they will both be upheld unless they are so antagonistic that both cannot operate. *People ex rel. Gill* v. *Devine Realty Trust,* 366 Ill. 418; *People ex rel. Reynolds* v. *Chicago, Burlington and Quincy Railroad Co.* 295 Ill. 191; *Hoyne* v. *Danisch,* 264 Ill. 467.

The provisions of section 18 of the Unemployment Compensation Act relative to the variable rates of contributions to be made by employers, as that act existed prior to any of the amendments of 1943, provided that for each calendar year, commencing after December 31, 1942, such contribution rates should be determined by the Director in accordance with the formula set out in said section 18. The variable rates provisions of the act first became effective on January 1, 1943. Section 18, relating to the rates of contributions by employers, provided that for each calendar year, commencing after December 31, 1942, the contribution rate for each employer should be computed in accordance with the formula set out in that section. The corresponding provisions in section 18, as amended by Senate Bill No. 399, provided the same method and set out the same formula for fixing the rates for the calendar year 1944 and subsequent years. It is, therefore, apparent that it was not the purpose of Senate Bill No. 399 to make any amendments to the existing provisions relating to the rates of contribution as contained in said section prior to any of the 1943 amendments. While it is true that section 18 was set out at length in the amendment contained in Senate Bill No. 399, this was necessary in order to comply with

the requirements of section 13 of article IV of the constitution that the amended section be inserted at length in the new act. All of the provisions relating to the rates of contribution to be paid, and the method of ascertaining those rates contained in the act as it existed prior to the 1943 amendments, were substantially repeated in the amendment to section 18 in Senate Bill No. 399. Those provisions of the existing act which were repeated, or substantially repeated, in the amendment of section 18 contained in Senate Bill No. 399, must be regarded as a continuation of such prior provisions and not as a new enactment. Ill. Rev. Stat. 1943, chap. 131, par. 2; *People* v. *Lloyd,* 304 Ill. 223; *Svenson* v. *Hanson,* 289 Ill. 242.

Turning to Senate Bill No. 398, which was an amendment of section 18 only, we find that all of the provisions of section 18, as it existed prior to any of the 1943 amendments, and all of the provisions of the amendment of said section contained in Senate Bill No. 399, were substantially repeated in Senate Bill No. 398. But, there was also inserted in Senate Bill No. 398, the War Risk Amendments. In Senate Bill No. 398, after setting out in substantially the same language all of the provisions contained in the existing act relative to the fixing of rates of contribution and the formula therefor, the War Risk Amendments were inserted. Under those amendments it was provided that the variable rates of contribution, as ascertained according to the formula set out in that section of the act, should be applicable to the last six months of 1943, and to the years 1944 and 1945. This, however, was followed by the provision that "Any provisions of this section to the contrary notwithstanding" each employer, who has paid wages in the calendar year 1942 which exceeded by 150 per cent the wages paid in the calendar year 1940, shall pay contributions on the wages paid in the last six months of the calendar year 1943 at the variable rate on the first $50,000 and 2.7 per cent on the excess over

$50,000. Those whose payment of wages in the calendar year 1942 exceeded by more than 100 per cent but less than 150 per cent the wages paid in the calendar year 1940 were required to pay, for the last six months of the calendar year 1943, the variable rate fixed by the Director on the first $50,000 of wages paid, and 2 per cent on the excess. It is further provided that employers who paid wages in the calendar year 1943, which exceeded by 150 per cent or more the wages paid for the calendar year 1940, shall pay contributions on wages paid in the calendar year 1944 at the variable rate determined by the Director under the formula set forth in the act on the first $100,000 of wages paid, and 2.7 per cent on wages paid in excess of $100,000. And, further, that for the calendar year 1944, where the employer had paid wages in the year 1943 exceeding by more than 100 per cent but less than 150 per cent the wages paid in 1940, the rate of contribution should be the rate determined by the Director in accordance with the provisions of the formula on the first $100,000 of the pay roll, and 2 per cent on the excess over $100,000. A like provision was made with reference to the rates to be paid in 1945, based upon a comparison of the wages paid in 1944 with the wages paid in 1940. These are the so-called War Risk Amendments.

It will thus be seen that section 18, as amended by both Senate Bill No. 398 and Senate Bill No. 399, provided for the determination of the variable rate by the Director for each employer by the same formula and method. This rate is to be based upon the experience of each employer and upon the experience in the State at large. The same formula was set out in the existing act, in Senate Bill No. 398, and in Senate Bill No. 399, for the determination of such variable rates by the Director. The only difference is that by the War Risk Amendments contained in Senate Bill No. 398, the last six months of the year 1943 and the years 1944 and 1945 were excepted

from the general provisions of the act, as to the rate of contributions to be paid by those employers whose pay rolls had increased in the years 1942, 1943 and 1944, more than 100 per cent over the year 1940. In other words, those employers whose pay rolls for the year 1943 had exceeded their pay rolls for the year 1940 by 100 per cent, and not more than 150 per cent, were required to pay, for the year 1944, the variable rate fixed by the Director on the first $100,000 of the pay roll, and 2 per cent on the excess. Those employers whose pay rolls in 1943 exceeded by 150 per cent or more the wages paid in 1940 were required to pay the variable rate determined by the Director on the first $100,000 of the wages paid in the year 1944, and 2.7 per cent on the excess.

For the year 1945, those employers who had paid wages in the year 1944 in excess of 100 per cent but less than 150 per cent more than the wages paid in 1940 were required to pay at the variable rate fixed on the first $100,000 of wages paid in 1945, and 2 per cent on the excess. Those employers whose pay rolls in 1944 exceeded by 150 per cent or more the wages paid in 1940 were required to pay, in the year 1945, the variable rate fixed on the first $100,000 of the pay roll, and 2.7 per cent on the excess.

The purpose of the War Risk Amendments and the intention in passing the same, as appears from the record, was to avoid insolvency of the unemployment compensation fund during the post-war period when pay rolls will normally decrease and claims for unemployment compensation increase. The additional rates were to be imposed upon employers whose pay rolls had expanded more than 100 per cent due to war conditions.

It is our conclusion that the two amendments are not so contradictory or inconsistent that both cannot be given effect. As already observed, the purpose of Senate Bill No. 399 was to make certain minor amendments and changes in section 18, which in nowise related to, or dis-

turbed or changed the provisions contained in the existing act with reference to the rates of contributions of employers to the unemployment compensation fund. In compliance with the constitution, the section amended was set out at length in the new enactment. Senate Bill No. 398 made the same amendments, but, in addition thereto, also contained the War Risk Amendments. Under these amendments the rates of contribution fixed under section 18, as it existed prior to the 1943 amendments, and as re-enacted in Senate Bill No. 399, were continued. But, employers who paid out wages, in the years 1942, 1943 and 1944, 100 per cent or more in excess of the wages paid by them in the year 1940 were given the benefit of the variable rates fixed by the Director, for the last six months of the year 1943, only on the first $50,000 of wages paid. On the excess over $50,000, they were required to pay a higher rate. For the years 1944 and 1945, they were given the benefit of the variable rates only on the first $100,000 of the pay roll. On the excess over $100,000, they were required to pay a higher rate. In other words, such employers were temporarily lifted out of the general provisions of section 18 with reference to the contribution rates for those years, and were required to pay a higher rate on the wages paid in excess of $50,000 in the last six months of 1943, and on the excess over $100,000 in the years 1944 and 1945.

The amendment of section 18, made by Senate Bill No. 399, was but a continuation of the existing provisions of that section. The War Risk Amendments in Senate Bill No. 398 constituted amendments to section 18 as it existed before the passage of Senate Bill No. 399, and as repeated in that amendment in compliance with the constitutional mandate that the amended section be set out at length in the new act. Section 18, as amended by Senate Bill No. 398, is not so inconsistent with that section as amended by Senate Bill No. 399 that both cannot stand

and be given effect. The effect of the War Risk Amendments in Senate Bill No. 398 was to modify section 18 as it originally existed and as re-enacted by Senate Bill No. 399 as a continuance of the same section of the existing act. The War Risk Amendments contained in section 18, as amended by Senate Bill No. 398, are effective to modify and qualify the provisions of the original act relative to the rates of contribution, and those provisions as re-enacted and set out at length in section 18 as amended by Senate Bill No. 399. Under this construction, both amendments can stand and be given effect.

This brings us to the contention of appellants that the War Risk Amendments denied to them the equal protection of the law, in violation of section 1 of the fourteenth amendment to the constitution of the United States; that said amendments constitute special legislation, in violation of section 22 of article 4 of the constitution of Illinois, and impose a burden upon employers who contribute to the unemployment compensation fund which is not uniform as to the class upon which it operates, in violation of section 1 of article IX of said State constitution.

We think the contention that the amendments constitute a denial of the equal protection of the law, in violation of the fourteenth amendment, is completely answered by what is said in the opinion of the Supreme Court of the United States in *Carmichael* v. *Southern Coal and Coke Co.* 301 U. S. 495, 57 L. ed. 868, in sustaining the Unemployment Compensation Act of the State of Alabama. With reference to an attack upon a classification of employers, it was there said: "Distinctions in degree, stated in terms of differences in number, have often been the target of attack, see *Booth* v. *Indiana,* 237 U. S. 391, 397, 35 S. Ct. 617, 59 L. ed. 1011. It is argued here, and it was ruled by the court below, that there can be no reason for a distinction, for purposes of taxation, between those who have only seven employees and those who have eight. Yet,

this is the type of distinction which the law is often called upon to make. It is only a difference in numbers which marks the moment when day ends and night begins, when the disabilities of infancy terminate and the status of legal competency is assumed. It separates large incomes which are taxed from the smaller ones which are exempt, as it marks here the difference between the proprietors of larger businesses who are taxed and the proprietors of smaller businesses who are not."

The contention that the War Risk Amendments are special legislation and impose upon the employers who are required to contribute to the unemployment compensation fund a burden which is not uniform as to the class upon which it operates, is based upon the classification of employers contained in the amendments. Under the amendments, the determining factor as to whether an employer shall pay his experience variable rate on his entire pay roll, or whether that rate shall be applied only to the wages paid which are not in excess of $100,000, and a higher rate on the excess over $100,000, is based upon a comparison of the wages paid during the next preceding calendar year with the wages paid during the calendar year 1940. It is obvious that the calendar year 1940 was selected as the basic year for comparison with the wages paid in future years because it was assumed that the calendar year 1940 was a normal year, uninfluenced by wartime conditions.

In the determination of the questions raised by this objection, the legislative history and background of the amendments, as well as the potential evils sought to be obviated, already referred to, must be kept in mind. The effect of the amendments is to classify employers into three classes. (1) Those employers who did not pay out as much as $100,000 in wages during the calendar year for which the rate is to be determined. Such employers pay according to their variable experience rate, determined by the Director, on their entire pay roll. (2) Those employ-

ers who paid wages during the next preceding calendar year which exceeded by more than 100 per cent but less than 150 per cent the wages paid for the calendar year 1940. Employers within this class pay their experience variable rate fixed by the Director on the first $100,000 of wages paid during the current calendar year. On the excess over $100,000, they pay at a war risk rate of 2 per cent. (3) Employers who paid wages during the next preceding calendar year which exceeded by 150 per cent or more the wages paid in the calendar year 1940. Such employers pay the variable experience rate fixed by the Director on the first $100,000 of wages paid during the current year, and a war risk rate of 2.7 per cent on the excess over $100,000.

It is argued that this is an unlawful and improper classification. It is contended that employers whose pay rolls have expanded in excess of 100 per cent are in no different class, with respect to the objectives and purposes of the Unemployment Compensation Act, than employers whose entire pay roll expansion is no greater than 99 per cent in excess of the wages paid in the calendar year 1940. Similarly, it is contended that an employer whose pay roll expansion has exceeded 150 per cent over the 1940 pay roll, with respect to that portion of his current pay roll between 100 per cent and 150 per cent greater than his 1940 pay roll, is in no different position than the employer whose pay roll expanded 100 per cent, but less than 150 per cent. It is said that an employer subject to the war risk rate of 2.7 per cent on the excess over $100,000 of his pay roll should only pay such war risk rate upon that portion of his pay roll which exceeds his 1940 pay roll by more than 150 per cent; that with respect to that portion of his pay roll which exceeds his 1940 pay roll by 100 per cent and not more than 150 per cent, he should be subject to the 2 per cent war risk rate, and not the higher rate of 2.7 per cent.

Appellants' notion of a fair distribution of the pay roll contributions is that an employer who paid wages during the next preceding calendar year of 150 per cent or more in excess of the wages paid by such employer in the cal-endar year 1940 should pay on the first $100,000 of his pay roll at the basic experience variable rate fixed by the Director; that as to the amount of such pay roll which exceeded the 1940 pay roll from 100 per cent to 150 per cent, he should be required to pay the war risk rate of 2 per cent and 2.7 per cent on the amount his pay roll was increased more than 150 per cent over his 1940 pay roll, and that the war risk amendments are invalid because they did not adopt such a plan.

The determination of the subjects and objects to which legislation shall apply, and the manner in which such legislation shall be applied, is primarily a question for the legislature. In *Stewart* v. *Brady,* 300 Ill. 425, we said: "Its classification of the objects of legislation is not required to be scientific, logical or consistent if it is reasonably adapted to secure the purpose for which it is intended and is not purely arbitrary. Legislative classification does not have to be so broad and comprehensive as to include all the evils which might by possibility be brought within its terms. Classification must be accommodated to the problems of legislation and must be palpably arbitrary to authorize a judicial review of it. It cannot be disturbed by the courts unless they can see clearly that there is no fair reason for the law that would not require with equal force its extension to others whom it leaves untouched. It is competent for a legislature to determine upon what differences a distinction may be made for the purpose of statutory classification between objects otherwise having resemblance, though such power cannot be arbitrarily exercised and the distinction must have a reasonable basis. (*International Harvester Co.* v. *Missouri,* 234 U. S. 199.) In that case attention is called to the distinction between

legislative power and the wisdom of its exercise in these words: 'It is to be remembered that the question presented is of the power of the legislature,—not the policy of the exercise of power. To be able to find fault, therefore, with such policy is not to establish the invalidity of the law based upon it.' "

Applying what is there said to the classification of employers by the War Risk Amendments, we do not think appellants have discharged the burden of showing that such classification does not rest upon a reasonable basis. From a consideration of the legislative history of the War Risk Amendments, the study made by the Board of Unemployment Compensation and Free Employment Office Advisors, under the direction of the Sixty-second General Assembly to make such study and report to the next session, (Ill. Rev. Stat. 1941, chap. 48, par. 234(d),) we are not convinced that the classification made was not necessary and appropriate to the accomplishment of the purposes of the legislation and the elimination of the evils sought to be remedied. It must be assumed that the legislature, in making the classifications, acted upon its experience, and as a result of its investigation and study of the conditions which the legislation was intended to remedy. A classification so made will not be disturbed by the courts unless it clearly appears that there is no fair reason or basis for the classification.

The relation of those employers whose pay rolls expanded more than 100 per cent over their pay rolls in the normal year of 1940 to the purposes of the amendments and the potential evils sought to be avoided is so different from those employers whose pay rolls have not expanded to that extent as to justify the first classification made by the amendments. Likewise the relation of those employers whose pay rolls have expanded more than 150 per cent over the normal basic year is so different from those employers whose pay roll expansions are between 100 per

cent and 150 per cent over the normal basic year as to constitute a sufficient basis for the second classification made by the amendments. Obviously, the greater the wartime expansion of the pay rolls, the greater the potential liability for the payment of unemployment compensation during the post-war period when there will be the greatest drain on the unemployment compensation fund. There is, therefore, a direct relation between war-expanded pay rolls and the potential liability which will be incurred as a result of war-time increase in employment. This constitutes an ample basis for the classifications made.

The final contention of appellants is that the determinations by the Director of the contribution rates for each appellant for the calendar year 1944 were not lawfully made under the Unemployment Compensation Act. Appellants are not in a position to raise this objection, in view of our holding that the War Risk Amendments are valid. This proceeding, as already noted, was a claim for refund under section 25(d) of the act.

Section 18(c)(7)(C) provides: "The Director shall promptly notify each employer of his rate of contributions for each calendar year as determined pursuant to this Section, by mailing notice thereof to his last known address. Such rate determination shall be final and conclusive upon the employer for all purposes and in all proceedings whatsoever, unless within 15 days after mailing of notice thereof, the employer files with the Director an application for review of such rate determination, setting forth his reasons in support thereof."

Section 25(a)(2) provides: "The Circuit Court of the county wherein the hearing was held shall by writ of *certiorari* to the Director have power to review all questions of law and fact presented by the record. Such suit by writ of *certiorari* shall be commenced within 20 days of the service of notice of the decision of the Director upon the employing unit affected thereby."

516

The record does not show that either of the appellants pursued the remedy provided by section 18(c)(7)(C), or by section 25(a)(2). Since we have upheld the validity of the War Risk Amendments, it follows that they are a part of section 18 and that determinations pursuant to them are pursuant to section 18. The determination, therefore, of the Director, as to the variable rates of appellants for the year 1944, was final and is not subject to review, either in the *certiorari* proceeding or in the *mandamus* cases involved on this appeal.

Counsel on both sides are to be commended upon the energy and clarity with which they have presented this most difficult case. It has been ably presented on both sides. The briefs have been a great aid to the court. From a careful consideration of all the authorities cited and of all the arguments made, we are of the opinion that the trial court did not err in quashing the writ in the *certiorari* case and dismissing the petitions for *mandamus*.

The orders of the circuit court of Cook county are affirmed.

*Orders affirmed.*